IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

| | |
|---|---|
| JENNIFER ROUSEY, | ) Civil Action No.  0:02-3378-JFA-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| HADDON HOUSE FOOD PRODUCTS, INC. | ) |
| | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendant. | ) |
| | ) |

Plaintiff, Jennifer Rousey ("Rousey), filed this action on October 9, 2002. She alleges

claims for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII").[1]  She also alleges claims under South

Carolina law for breach of contract and breach of an implied covenant of good faith and fair

dealing.  Defendant is Haddon House Food Products, Inc. ("Haddon House" or "the Company").

On November 15, 2004, Haddon House filed a motion for summary judgment.  Rousey filed a

memorandum in opposition to summary judgment on December 2, 2004.  Haddon House filed a

reply on December 10, 2004.

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g),
DSC.  Because this is a dispositive motion, this report and recommendation is entered for review
by the court.

FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

1.    Haddon House is a wholesale specialty food distributor, which distributes food items to grocery stores around the country.  The Company is based in New Jersey, and has a distribution facility in Richburg, South Carolina.  Robert Blake Dep. 9.

2.    Rousey, a white female, was employed by Haddon House at its Richburg facility from July 16, 1996 to May 21, 2001.

3.    Rousey was initially hired as a loader in Haddon House's warehouse.  In 1997, Rousey became a computer room operator.  In September 1998, she became a payroll clerk. Rousey Dep. 19, Ex. 6.

4.    Robert Blake ("Blake") is the General Manager for Haddon House's Richburg facility. He is the Company's highest-level employee at the Richburg facility and supervises approximately 200 employees.  Blake Dep. 8-9.

5.    Rousey's immediate supervisor was Sandra Huffstickler ("Huffstickler"), the office manager.  Rousey Dep. 24; Huffstickler Dep. 10.

6.    Blake dated Tammy Ernandez ("Ernandez"), a Haddon House employee and a friend of Rousey.  Their relationship ended in approximately January 2001.  Ernandez Dep. 84. After Blake and Ernandez's relationship ended, Blake told Rousey that he would give her a raise if she could get Ernandez to have sex with him (specifically if Rousey could persuade Ernandez to give Blake "another shot of ass").  Rousey Dep. 43, 59.  Later that day, Rousey reported to Huffstickler that the conversation made her uncomfortable. Huffstickler Dep. 23.

2

7.    Blake showed Rousey pornographic pictures on his computer, including pictures of naked women, a picture of a woman "sitting on" a soda bottle, and pictures of tattoos and piercings on genitalia.  Rousey Dep. 38, 44-46.

8.    Blake told Ernandez that Rousey had sexually transmitted diseases and was "nasty" because Rousey dated outside her race.  Rousey Dep. 53.

9.    Blake discussed Rousey's sex life, commenting on Rousey's sexual partners.  He told Stacey Dye ("Dye")[2] that Dye should "give her some" more often because it put a smile on her face, asked Rousey about the size of Dye's penis, asked her if black men were more endowed than white men, and asked Rousey if she liked "butt action" (Blake's euphemism for anal sex).  Rousey Dep. 39, 115-116.

10.    Blake told "dirty" jokes in the workplace to Rousey and other employees.  He told dirty jokes once or twice a week, Rousey would "turn red" a lot when dirty jokes were told, Rousey did not "get" the jokes, and Blake attributed Rousey's inability to understand jokes to her being blonde.  Ernandez Dep. 17, 100.  Blake admitted that he would tell a dirty joke whenever he would hear one (which might be once a week, once every two weeks, or once a month).  Blake Dep. 29.

11.    In the presence of Rousey and other employees, Blake presented an oversized gag gift condom and stated he was going to tell Dye that Dye left the condom in Rousey's car. Rousey was embarrassed and asked Blake not to do so.    Blake brought the condom to Rousey's office and asked Rousey if it was big enough to fit Dye.  Blake proceeded to

---

[2]Dye, a black male, was a Haddon House employee who dated Rousey.

present the condom to Dye by throwing it on a table in the break room where employees were sitting.  He told Dye that Rousey said Dye had left the condom in her car the night before.  Blake admitted giving the condom to Dye at work and described it as a joke. Blake Dep. 66-76; Rousey Dep. 39-41; Ernandez Dep. 64, 89-90.

12.    During 2000, Donna Case ("Case") began to work in the front office to learn Rousey's payroll job in case Rousey was absent from work.  Case Dep. 6-7.

13.    Approximately one week prior to her termination, Rousey met with James Hulsizer ("Hulsizer"), Haddon House's Vice President for Human Resources.  Rousey Dep. 66-68. Hulsizer was visiting the Richburg facility in early May 2001 from his office in Medford, New Jersey.  Rousey tried to tell Hulsizer about the pornographic pictures and sexual comments by Blake.  Hulsizer told Rousey that he could not believe she was making the accusations and she "was about five minutes away from being fired."  Rousey Dep. 67.

14.    During the same time frame that Rousey met with Hulsizer, Blake told Huffstickler to write up Rousey for being late.  Huffstickler Dep. 34.  Huffstickler did so in a Record of Conversation, stating that Rousey "needs to start being here on time."  Rousey Dep., Ex. 5.

15.    On May 15, 2001, Rousey arrived at the office approximately ten minutes prior to 8:00 a.m. (her start time).  Her purse fell over in her car and her time badge got lodged under the seat.  Huffstickler stopped at Rousey's car.  They attempted to retrieve the badge, but were unable to do so.  Huffstickler told Rousey to go into the building because she was going to be late.  Rousey went into work and wrote herself in at 8:00 a.m.  She told Huffstickler, who told Rousey that it was alright.  Rousey Dep. 92.

4

16.     Case claims that she saw Rousey arrive at four minutes after 8:00 a.m.  Case Dep. 30-32.

17.     A meeting was held between Blake and Rousey, with Hulsizer participating by telephone. Blake terminated Rousey at the meeting.

18.     Case took over Rousey's payroll job after Rousey was terminated.  Case is currently the Office Supervisor for Haddon House's Richburg facility.   Case Dep. 24, Case Aff.

19.     On June 1, 2001, Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission ("SCHAC") and the Equal Employment Opportunity Commission ("EEOC").  Plaintiff's November 16, 2004 Motion for Sanctions, Ex. 1.

## MOTION FOR SUMMARY JUDGMENT

Haddon House argues that it is entitled to summary judgment because Rousey fails to establish a hostile work environment claim; she cannot establish a claim for quid pro quo harassment; she cannot establish a prima facie case of retaliation; Haddon House has articulated a legitimate, non-discriminatory reason for its actions that Plaintiff fails to show is pretextual; Rousey fails to show that the Company's handbook constituted an employment contract; Haddon House did not breach any employment contract; and Rousey's implied covenant claim must be dismissed because the parties did not enter into a contract.

## SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  Id.  Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  Ballinger v. North Carolina Agric. Extension

5

Serv., 815 F.2d 1001, 1005  (4th Cir.), cert. denied, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial."  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).  The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995).  Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial.  Baber, citing Celotex Corp., supra.  Moreover, the non-movant's proof must meet "the substantive

6

evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7.  Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 80 F.3d 954 (4th Cir. 1996).

A.    Hostile Environment

Rousey alleges she was subjected to a hostile work environment.  Haddon House argues that Rousey cannot establish a hostile environment claim because she cannot demonstrate that she was harassed because of her sex and she fails to show that the alleged harassment was severe or pervasive.  The Company argues that even if the conduct could be construed as unlawful harassment, Haddon House took prudent measures to prevent and remedy the alleged misconduct.

To prevail on a Title VII hostile environment claim based on gender, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 710 (4th Cir.1995) (en banc); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir.2003) (en banc), cert. denied, 540 U.S. 1177 (2004).

(1)    Based on Sex

Rousey argues that the harassment was based on her sex because she was singled out for humiliation in the telling of jokes, Blake discussed her sex life, and the condom

7

incident was specifically designed to humiliate her. Haddon House argues that Rousey cannot prove that any alleged harassment was because of her sex. The Company argues that Blake's behavior was aimed at both male and female employees, the pictures on his computer and telling of jokes were not attributable to Plaintiff's gender as they were shown and told to both men and women, his crude comments were directed to both male and female employees, and his comments about Ernandez were attributable to the breakup of that relationship and not Rousey's sex.

In the light most favorable to Plaintiff, the harassment was based on her sex as it involved comments by Blake about her sex life, Blake appeared to single her out to tell her jokes and would laugh at her because she did not "get" the jokes (see Blake Dep. 82 and 84), the condom incident was directed at her, Blake continued the condom "joke" with Dye despite Rousey's protests, and Rousey appears to have been singled out to receive a raise if she could get Ernandez to have sex with Blake.

(2)     Severe and Pervasive

Haddon House argues that the alleged harassment was not severe and pervasive because Rousey cannot show that the alleged incidents were subjectively or objectively offensive. The Company also argues that Rousey cannot show she was subjectively offended by Blake's behavior because she engaged in similar behavior, showing male and female employees sexually explicit pictures on her computer, telling dirty jokes, discussing her sex life with male and female employees, commenting on her "well-endowed" boyfriend, and propositioning a male co-worker.[3] Additionally, Haddon House argues that Rousey cannot show Blake's behavior was

---

[3]Gerald Howard, the assistant plant manager at the Richburg site, testified that Rousey
(continued...)

8

sufficiently severe or pervasive because there is no evidence that the harassment interfered with her ability to perform her job or required her to go to a doctor. Rousey argues that the harassment was subjectively and objectively offensive and she was upset and embarrassed by the harassment. She denies that she engaged in behavior similar to Blake's behavior. Plaintiff's Opposition Memorandum at 16.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22(1993)). Actionable sexual harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21. Title VII does not reach "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex... [I]t forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's

---

[3](...continued)
discussed her own sex life in the workplace by stating that her boyfriend was well-endowed. Howard Dep. 66. Huffstickler stated that Blake told Rousey about an internet pornographic site which Rousey pulled up on one occasion on her (Rousey's) computer. They looked at the site and then Huffstickler told Rousey to get off the site. Huffstickler Dep 17-18, 80. Huffstickler also stated that she and Rousey talked about personal things, including sexual things. Huffstickler Dep. 80-81. Case testified that she heard Jennifer tell dirty jokes about once or twice a week and she viewed dirty pictures on Rousey's computer. Case Dep. 10-13, 17. Leon Donnell Thompson, a warehouse shift supervisor, stated that Rousey discussed her sex life with him and told him what she would do to him sexually if she got him into bed. Thompson Dep. 35-38. He also thought that Rousey showed him a picture of a naked person. Thompson Dep. 33-34.

employment." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998), citing, Harris 510 U.S. at 21.

Among the circumstances examined are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. at 21."While we do not approve of [the employer's] apparent willingness to offend and provoke employees with his ambiguously sexual innuendos, Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Id. at 754; see also Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.1995) ("The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women…It is not designed to purge the workplace of vulgarity.").

In the light most favorable to Plaintiff, the harassment was objectively offensive and was severe and pervasive. The harassment occurred over a period of time and included numerous incidents such as: (1) an offer of a raise if Rousey could persuade Ernandez to have sex with Blake, (2) the showing of pictures with a sexual content, (3) comments by Blake about Rousey's sex life, (4) the "condom incident", and (5) the telling of jokes with a sexual content. There is a question of fact as to whether the conduct was subjectively offensive, as Plaintiff testified that she was upset and embarrassed by the actions (Rousey Dep. 104-105), but the parties have presented conflicting testimony regarding Plaintiff's participation in such activities as telling jokes, discussions of her sex life, and looking at sexual pictures.[4]

---

[4]Plaintiff denies telling dirty jokes. Rousey Dep. 27. Thompson could not recall any specific
(continued…)

(3)     Remedial Action

Haddon House argues that even if the alleged conduct is construed as unlawful harassment, it took prudent measures to prevent and remedy the alleged misconduct, thereby precluding liability because Rousey has no basis upon which to impute liability to the Company. Haddon House provides that it maintained a comprehensive sexual harassment policy in its employee handbook (the "Handbook"), it distributed the Handbook to its employees, Rousey received a copy of the Handbook when she was hired, the Handbook provided examples of conduct that could constitute sexual harassment and a formal system for reporting complaints of sexual harassment, Haddon House provided its employees with information outlining its Employee Relations Hotline Number, Rousey received a copy of the Hotline information, and she knew employees were to contact Human Resources if they had a problem. The Company claims that Rousey never utilized the avenues provided to complain about harassment. Rousey contends that the defense is not available because she was subjected to harassment by a supervisor and subjected to the tangible employment action of termination. She also claims she took advantage of the available measures and that the measures to report harassment were not effective.

In Burlington Industries, Inc. v. Ellerth 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by [the employee's]

---

[4](...continued)
incident as to his viewing pornography on Rousey's computer. Thompson Dep. 33-35. Huffstickler testified that Blake was the one who gave the pornographic internet site to Rousey. Huffstickler Dep. 17-18. The alleged incidents of Rousey's own conduct did not involve Blake or show that she welcomed harassing behavior from Blake.

supervisor." <u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807.  However, when no tangible

employment action is taken (such as termination, a demotion, or a transfer), an employer may

defend against liability or damages if it established by a preponderance of the evidence: "(a) that

the employer exercised reasonable care to prevent and correct promptly any sexually harassing

behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any

preventative or corrective opportunities provided by the employer to avoid harm otherwise." <u>Id.</u>

Haddon House argues that it is entitled to the <u>Faragher</u> defense because Rousey was not

subjected to a tangible employment action by Blake as Hulsizer states that Rousey was terminated

by Hulsizer, not Blake.  <u>See</u> Hulsizer Aff.  There is a genuine issue of material fact, however, as

to who terminated Rousey.  Rousey claims Blake terminated her, which is supported by Case's

testimony that Blake terminated Rousey at the meeting between Rousey, Blake, Case, and Hulsizer

(by telephone).  Case Dep. 55-56.  Thus, Haddon House has not shown that it is entitled to the

<u>Faragher</u> defense.

B.    <u>Tangible Employment Action/Quid Pro Quo</u>

Rousey alleges that she was subjected to quid pro quo harassment because Blake

told her that he would give her a raise if she could persuade Ernandez to have sex with him.

Haddon House argues that Rousey cannot establish a claim for quid pro quo harassment because

any alleged harassment was not unwelcome, it was not based on sex, and it did not affect the

tangible aspects of Rousey's employment.

The Fourth Circuit has recognized that "quid pro quo sexual harassment can be established

by a five-element prima facie case:" (1) "[t]he employee belongs to a protected group;" (2) she

was "subject to unwelcome sexual harassment;" (3) "the harassment complained of was based upon

12

sex;" (4) "[t]he employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment;" and, (5) "the employer … knew or should have known about the harassment and took no effective remedial action." Spencer v. General Electric Co., 894 F.2d 651, 658 (4th Cir.1990); see also Lewis v. Forest Pharmaceuticals Inc., 217 F.Supp.2d 638, 646 (D.Md.2002); Rachel-Smith v. FTData, Inc., 247 F.Supp.2d 734, 745 (D.Md.2003)(noting that Spencer was overruled on other grounds by Farrar v. Hobby, 506 U.S. 103 (1992)).

In the light most favorable to Plaintiff, she has established a quid pro quo claim.  Haddon House argues that the harassment was not based on Rousey's gender, but because of her friendship with Ernandez.  In the light most favorable to Plaintiff, however, this action was based on sex because Blake conditioned Plaintiff's raise on her obtaining sexual favors for Blake.

The Company also appears to argue that the conduct was not unwelcome because Rousey laughed at the time.  Rousey, however, approached Huffstickler after the incident to complain that it made her uncomfortable.  Haddon House also argues that Rousey has not shown that there was a tangible employment action because she has not shown that she reacted to Blake regarding the alleged incident and she has no evidence to show that this had to do with her termination.   Rousey testified, however, that Blake's "shot of ass" comment was "maybe a month before I was fired." Rousey Dep. 59.   In the light most favorable to Plaintiff, Rousey has shown that there was a tangible employment action because she was offered a raise in pay if she could persuade Ernandez to have sex with Blake.

C.     Retaliation

Rousey contends that she was terminated from her job in retaliation for reporting Blake's harassment to Hulsizer.  Haddon House argues that Rousey fails to establish a prima facie case of retaliation because she fails to show she engaged in protected activity and even if she could establish a prima facie case, the Company has articulated a legitimate, non-retaliatory reason for her termination.

To establish a prima facie case of retaliation, it must be demonstrated that:

1)     the employee engaged in protected activity;

2)     the employer took some adverse employment action against the employee; and

3)     a causal connection existed between the protected activity and the adverse action.

See Haulbrook v. Michelin North America, Inc., 252 F.3d. 696, 706 (4th Cir. 2001)(ADA); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998)(ADEA and Title VII); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994)(Title VII).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

(1)     Prima Facie Case

Rousey alleges that she engaged in protected activity by talking to Hulsizer about Blake's alleged harassment.  Haddon House argues that Rousey did not engage in protected activity because she did not complain to Huffstickler or Hulsizer about the alleged discrimination or harassment.

14

A plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Industries, Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

In the light most favorable to Plaintiff, she has established a prima facie case of retaliation because she engaged in protected activity, she was subjected to the adverse employment action of termination, and there appears to be a causal connection between the protected activity and her termination shortly thereafter. Rousey has presented evidence that she engaged in activity that may be protected activity because she met with Hulsizer and tried to discuss the pornographic pictures and sexual comments with him (Rousey Dep. 66-67), she asked Blake to stop embarrassing her during the condom incident and told him to quit spreading stories about her having sexually transmitted diseases (Rousey Dep. 51, 53-54), she told Huffstickler that it bothered her that Blake was talking about her sex life, she reported the condom incident to Huffstickler, and she reported the "shot of ass" comment to Huffstickler (Rousey Dep. 49-50, 52).

(2)     Legitimate, Non-Discriminatory Reason

Haddon House argues that even if Rousey can establish a prima facie case of retaliation, it has articulated a legitimate non-discriminatory reason for terminating Rousey, that she falsified her time records. Rousey argues that the proffered reason is pretextual because the four minutes involves a dispute between Rousey and Case, as Huffstickler testified that the time

15

clock, if it had been used, would have given Rousey full credit for arriving at 8:00 a.m., even if she clocked in at 8:04.  See Huffstickler Dep. 46.[5]

Rousey has presented sufficient evidence that a jury could find Haddon House's reason for her termination to be pretextual.  Huffstickler was present when Plaintiff arrived on the morning in question and did not appear to have a problem with Rousey recording her arrival time as 8:00 a.m.  Huffstickler testified that up until eight minutes after the hour, the clock would "jump back" to 8 a.m. and if an employee arrived at 8:04 a.m., the time clocked would show 8:00 a.m. Huffstickler Dep. 46.

> D.    Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing

Rousey alleges that the Handbook constituted a contract of employment which Haddon House breached by failing to follow procedures concerning corrective actions and terminations.  She also alleges that implied in the Handbook was a covenant of good faith and fair dealing, which Haddon House also breached.  Haddon House argues that it did not enter into an employment contract with Rousey because its policies do not give rise to a promise, expectation, and benefit of employment and it did not abolish the at-will relationship.  Specifically, Haddon House contends that the Handbook maintained discretion in discipline because a portion of the Handbook provides that the Company would attempt to retain the services of competent employees.  Handbook (Rousey Dep, Ex. 3) at 18.  Haddon House further argues that even if an employment contract existed, it was not breached and Rousey's falsification of her time record

---

[5]Defendant disputes that the clock operates in this manner.

constituted her own material breach which precludes her from seeking relief pursuant to any employment contract.[6]

South Carolina has long recognized the doctrine of employment at-will. Pursuant to this doctrine, "a contract for permanent employment, so long as it is satisfactorily performed, which is not supported by any consideration other than the obligation or service to be performed on the one hand and wages to be paid on the other, is terminable at the pleasure of either party." Shealy v. Fowler, 188 S.E. 499, 502 (S.C. 1936). Under South Carolina law, an at-will employee may be terminated for any reason or for no reason at all. Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213 (S.C. 1985). Under South Carolina law, employment-at-will status can be altered by promises made to an employee in policies, employee handbooks, and employee bulletins. Small v. Springs Industries, 357 S.E.2d 452 (S.C. 1987). An employer who wishes to issue a handbook as an advisory statement with no intent on being bound by it must "insert[] a conspicuous disclaimer or provision into the written document." Springs, 357 S.E.2d at 455.[7]

Rousey appears to allege that mandatory language in the disciplinary procedures constitutes a contract. She contends that the contract was breached because these disciplinary procedures were not followed. Specifically, she argues that her supervisor (Huffstickler) was not consulted on the issues related to her termination such that Huffstickler could not have investigated the incident thoroughly, there was no counseling, any counseling on the falsification charge was

---

[6]As discussed above, there is a question of fact as to whether Rousey falsified her time record. Haddon House appears to now argue that Rousey was also terminated for attendance problems, but there is a question of fact as to whether attendance was an articulated reason for her termination.

[7]Haddon House does not appear to claim that the Handbook's disclaimer was "conspicuous."

neither extensive nor well-documented, and she was not given ample opportunity to state the situation from her point of view.

An employer's written documents may alter the at-will relationship and create an implied employment contract if the employer phrases the document's language in mandatory terms  giving "rise to a promise, an expectation and a benefit" to an employee.  Fleming v. Borden, Inc., 450 S.E.2d 589, 596 (S.C. 1994).  The Handbook contains steps for corrective actions.[8]  There is, however, a question of fact as to whether the corrective action guidelines contain mandatory language.  Thus, it is recommended that summary judgment be denied as to Plaintiff's breach of contract claim.  As there is a question of fact as to whether there is a valid employment contract,

_____

[8]Specifically, the Handbook provides:

**Step One**: If an employee is not performing his or her job in a satisfactory manner after being properly trained, or an infraction of general accepted work policies occurs, a meeting with his/her immediate supervisor is held to discuss the problem and a record of conversation is issued to the employee.

**Step Two**; Should an employee continue to perform their job in an unsatisfactory manner or if infractions of general work policy continue, your supervisor and the warehouse manager will counsel you.  A first warning will be issued along with specific steps for improvement and entered in your personnel file.

**Step Three**: If another infraction of general accepted work policy occurs or the employee continues to perform his/her job unsatisfactorily the employee will be given a day off with pay to evaluate the situation.  Another meeting will be held with his/her supervisor and the warehouse manager and a final warning will be issued.

**Step Four**: Failure of our corrective action procedures to change an employee's undesirable behavior will result in termination of employee.

Handbook at 8.

it is also recommended that summary judgment be denied to Rousey's breach of good faith and fair dealing claim.[9]

## MOTION FOR SANCTIONS

On November 15, 2004, Rousey moved for sanctions raising four issues: (1) Haddon House destroyed Blake's computer which was used to display pornography to Rousey and others; (2) Haddon House presented a false affidavit to SCHAC which was coerced from Ernandez; (3) an unidentified document signed by Huffstickler was not produced in discovery; and (4) Haddon House failed to completely and truthfully respond to interrogatories concerning Blake's behavior.

1.    Spoliation

"Spoliation refers to the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation...The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'" Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (internal citations omitted). The duty to preserve material evidence may arise

---

[9]Haddon House correctly argues that such a claim cannot be found where there is no employment contract. "Under South Carolina law, there exists in every contract an implied covenant of good faith and fair dealing." Shelton v. Oscar Mayer Foods Corp., 459 S.E.2d 851, 857 (S.C. Ct. App. 1995), aff'd, 481 S.E.2d 706 (S.C. 1997). The commercial contract covenant of good faith and fair dealing, however, is not implied in employment at-will. Grooms v. Mobay Chemical Corp., 861 F. Supp. 497 (D.S.C. 1991)(policy manual which was not written in mandatory terms and contained vague and unspecific language did not constitute an enforceable contract which would limit employer's right to discharge an at-will employee), aff'd, 993 F.2d 1537 (4th Cir. 1993), cert. denied, 510 U.S. 996 (1993); Satterfield v. Lockheed Missiles and Space Co., Inc., 617 F. Supp. 1359 (D.S.C. 1985).

prior to litigation when a party reasonably should know that it may be relevant to anticipated litigation. Id. at 591.

As discussed above, Blake showed Rousey pornographic images on his office computer.[10] Haddon House became aware of the specific allegation concerning Blake's computer during the EEOC process. See letter from Lori Halber dated October 25, 2001 attached to Pl. Mem. for Sanctions, Ex. 4.[11] Rousey filed her complaint in this Court on October 9, 2002. It contained a specific allegation relating to Blake showed her pornography on his computer. Rousey served a production request for the computer on January 20, 2003. Haddon House responded on February 21, 2003 that it "is investigating whether it is possession of the computers used by Robert Blake in calendar years 2000 and 2001." Pl. Mem. for Sanctions, Ex. 4. From that point forward, Rousey diligently pursued discovery concerning Blake's computer.[12] After much back and forth, Haddon House admitted that the computer in question had been replaced and destroyed "after May 10, 2002." Pl. Mem. for Sanctions, Ex. 9.

"The spoliation doctrine authorizes a court to order dismissal, to grant summary judgment, or permit an adverse inference to be drawn against a party, as a means to level the evidentiary

---

[10]In his deposition, Blake admitted to showing pornographic depictions to some supervisors and Ernandez, but could not recall showing them to Rousey. He claimed the pornography was received by e-mail and Spam. Rousey asserts that the images were from pornographic web-sites visited by Blake.

[11]Halber and her Philadelphia law firm represented Haddon House until March 21, 2003.

[12]In this regard, the undersigned granted Haddon House's motion for a protective order when Rousey sought to depose Philadelphia counsel who had been relieved and ordered Haddon House to produce unredacted copies of documents relating to the issue which Haddon House had claimed were privileged.

playing field and for the purpose of sanctioning improper conduct. The application of this rule must take into account the blameworthiness of the offending party and the prejudice suffered by the opposing party." Hartford Ins. Co. of the Midwest v. American Automatic Sprinkler Sys., Inc., 23 F.Supp.2d 623, 626 (D.Md. 1998), aff'd, 201 F.3d 538 (4th Cir. 2000) (citations and quotations omitted).

Rousey seeks an order of this Court granting summary judgment in her favor as a sanction. This, of course, would constitute the most drastic sanction possible. To impose such a sanction the moving party must show, and the Court must find, that the evidence was intentionally destroyed accompanied by bad faith of the destroying party. Cole v. Keller Industries, Inc., 132 F.3d 1044, 1047 (4th Cir. 1998). Rousey has made no such showing. According to Haddon House, the computer was replaced and destroyed as the result of a "computer conversion" or upgrade. (Pl. Mem. for Sanctions, Ex. 10). Rousey has produced no evidence to the contrary.

Alternatively, Rousey seeks an adverse inference instruction be given to the jury. To obtain such an instruction, Rousey must show:

> (1)    the party having control over the evidence had an obligation to preserve it when it was destroyed or altered;
>
> (2)    the destruction or loss was accompanied by a culpable state of mind; and
>
> (3)    the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable fact finder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

Thompson v. U.S. Dept. of Housing and Urban Development, 219 F.R.D. 93, 101 (D.Md. 2003) citing Residential Funding v. Degorge Fin. Corp., 306 F.3d 99, 107-108 (2d. Cir. 2002) and Zubulake v. UBS Warburg LLC, 2003 WL 22410619 at *6 (S.D.N.Y. 2003). (internal quotations

omitted). The "culpable state of mind" element can be satisfied by showing "bad faith/knowing destruction; gross negligence; and ordinary negligence." Id.

Based on this record, the undersigned concludes that Haddon House became aware of Rousey's allegation during the EEOC process. This process is the necessary step prior to litigation giving Haddon House reason to know that litigation was anticipated. Haddon House had possession of the computer at that time and even after that process had ended. The destruction was accompanied by a culpable state of mind in that it was at least negligent with respect to the destruction of the computer. An inference of higher culpability than negligence may be drawn from the fact that Haddon House changed the dates of the destruction of the computer in its discovery responses and Blake (evasively) admitted to this allegation after the computer and discarded. Last, the evidence was relevant because the computer with pornography would have supported Rousey's claims.

Therefore, the undersigned recommends that Rousey's motion for sanctions be granted to the extent it seeks an adverse inference instruction at trial.

2.      Other Grounds for Sanctions

The other grounds for sanctions raised by Rousey are without merit. Ernandez signed an exculpatory affidavit which was presented by Haddon House to SCHAC. She is no longer employed by Haddon House and now refutes the affidavit. Haddon House has not presented the Ernandez affidavit to his court for any purpose. Huffstickler testified at her deposition that she signed a document at some point which would be in her personnel file. The file has been produced, but does not contain the document. Haddon House disavows knowledge of any such document. Rousey waived any concerns about answers to interrogatories and

22

document production requests at a hearing held September 27, 2004.  See Order filed September 28, 2004.  Rousey has filed no motions with respect to Haddon House's supplemental responses.

<u>CONCLUSION</u>

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 39) be denied.  It is also recommended that Plaintiff's motion for sanctions (Doc. 42) be denied in part (as to the Huffstickler document, Ernandez affidavit, and interrogatories) and the sanction of an adverse inference at trial be granted as to Blake's computer.

Respectfully submitted,

s/Joseph R.  McCrorey
United States Magistrate Judge

July 22, 2005

Columbia, South Carolina